CANADY, J.,
concurring in result.
I concur with the majority’s decision reversing the portion of the trial court’s order granting a new penalty phase and affirming the portion of the trial court’s order denying a new guilt phase. Even assuming that Thomas Woodel demonstrated that his trial counsel conducted an unreasonable penalty phase investigation, Woodel failed to establish that he was prejudiced as required by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
In this case, the postconviction court wrote a detailed order in which it concluded that trial counsel erred by failing to: (1) consult a toxicologist or similar expert to testify about the role Woodel’s alcohol abuse played in the crimes; (2) investigate and present a multigenerational history showing the pattern of alcoholism, abuse, and abandonment in Woodel’s family; (3) present a reasonably competent mental health evaluation; and (4) file a motion to exclude witness White’s testimony. The postconviction court did not, however, include any reasoning for its conclusion that these errors prejudiced Woodel. I agree ■with the majority’s determination that the postconviction court’s unexplained finding of prejudice cannot withstand scrutiny.
After explaining the legal error in the postconviction court’s determination that trial counsel erred by failing to file a motion to exclude White’s statements, the *808 majority — contrary to the dissent’s criticism — examines “whether counsel’s deficiency as a whole operated to undermine confidence in the outcome of the penalty phase.” Dissenting op. at 812. The majority explains that the “allegedly unexplored mitigating circumstances” were either cumulative to mitigating evidence actually presented, insufficiently proven at the evi-dentiary hearing, or not significant enough to undermine confidence in the penalty phase as required by Strickland. Majority op. at 803. As a result, the majority concludes that even when considered cumulatively, “the assertions that trial counsel’s professional errors deprived Woodel of a fair second penalty phase fail to satisfy the prejudice prong of the Strickland standard.” Majority op. at 803. This conclusion — unlike the postconviction court’s unexplained finding of prejudice — is supported by the record.
During the 2004 penalty phase, trial counsel called Woodel, his sister Bobbie, his father Albert, and an aunt who helped raise them to testify about the abuse and extreme neglect Woodel suffered as a child. Woodel and Bobbie also testified about Woodel’s adult life, including his abuse of alcohol. The defense then called Dr. Henry Dee, a clinical psychologist and neuropsychologist, who explained the psychological impact of Woodel’s experiences and addressed some of the unique difficulties that Woodel suffered as a result of being a hearing child of deaf parents.
Based on this testimony, the sentencing court concluded that the defense proved four statutory mitigating factors — including both mental health mitigating factors — and fourteen nonstatutory mitigating factors. Regarding the circumstances of the offense, the sentencing court found that on the night of the crime, Woodel felt “acutely alone” and quickly drank “an unquantified amount of beer that may have been as much as twenty-four cans or bottles,” that left Woodel unable to “recall what he was doing during some of the time leading up to the crime.” State v. Woodel, No. CF97-00047A-XX at 5-6 (Fla. 10th Jud. Cir. Jul. 1, 2005) (Sentencing Order). When reviewing Woodel’s background, the sentencing court concluded that Woodel had been neglected and rejected by his parents and others. The sentencing court stated that Woodel’s parents were alcoholics and described his father as “often cruel” and his mother as unreliable and uncaring. Id. at 6. The sentencing court included examples of the hardships endured by Woodel, including that Woodel and his sister were once left so hungry that they had to steal food from a neighbor, that Woodel’s brother had tried to drown him, that all three children were abandoned without explanation at a children’s home, and that Woodel may have been sexually abused by a person invited into the home by one of his parents.
The sentencing court found these mitigating factors were weighty but ultimately concluded that they did not outweigh the serious aggravating factors that applied to the murder of Bernice Moody: (1) Woodel was previously convicted of a contemporaneous capital felony; (2) the murder was committed during the commission of a burglary; (3) the murder was especially heinous, atrocious, or cruel; and (4) the victim was particularly vulnerable due to advanced age or disability. Id. at 2-4. The sentencing court explained that Woo-del’s impaired capacity could not be given more than moderate weight due to the “pitiless, cruel manner in which he murdered Mrs. Moody” and reasoned that the period during which Woodel ceased stabbing Bernice to search for a heavy object to use as a bludgeon established that Woo-del “was not substantially impaired *809 throughout the entire episode.” Id. at 5-6.
The mitigating evidence presented during the postconviction evidentiary hearing primarily differed from the penalty phase evidence in that it provided more detail about deaf culture and documented the dysfunction of several generations of Woo-del’s extended family, not just the family members who spent considerable time with Woodel. The postconviction evidence— considered as a whole — did not, however, paint a materially different picture of Woo-del’s mental state or “change[] the very nature of the crime.” Dissenting op. at 820. No evidence at the hearing established a reason — other than burglary — for the attack or refuted the evidence that despite Woodel’s intoxicated state and usual mild demeanor, the attack on Bernice lasted for “some time” and involved both the repeated stabbing and bludgeoning of a partially disabled seventy-four-year-old woman. Sentencing Order at 5. Regardless of any flaws in trial counsel’s investigation, the postconviction presentation did not undermine confidence in the 2004 penalty phase.
The dissent’s position that Woodel did prove that he was prejudiced appears to rest primarily on an exaggerated view of the differences between the postconviction testimony of clinical psychologist Dr. Alan Marcus and Dr. Dee’s 2004 penalty phase testimony. The dissent rests on the unfounded conclusion that “Dr. Marcus’s testimony, if it had been presented, would have provided the jury a completely different picture of how the crime occurred and substantially increased the mitigation available to the finder of fact.” Dissenting op. at 817.
First, Dr. Marcus’s testimony did not establish a mitigating “possible explanation as to how this baffling crime transpired.” Id. At the evidentiary hearing, Dr. Marcus testified that “in the early days before the advent of flashing lights and doorbells[] that would have lights and buzzers,” deaf people “usually left their doors open” because “if they locked them and they had a guest or visitor ... they would never hear the door pounding.” Dr. Marcus then explained that as a corollary, “it’s not unusual or unheard of for deaf people to show up at another deaf person’s home and actually just walk in.” Dr. Marcus also testified that likely as a result of frequent interaction with deaf individuals during his childhood, Woodel “really wouldn’t think twice about walking in without knocking” when going to a friend’s home. Dr. Marcus did not, however, testify that Woodel habitually walked uninvited and unannounced into the homes of strangers.
Furthermore, Woodel’s own penalty phase testimony refuted the theory that due to his upbringing in the deaf community and his intoxication, he mistakenly believed that it was appropriate for him to enter the Moodys’ trailer without invitation. Woodel testified that when he first approached the screen porch door of the Moodys’ trailer, he “stood there waiting for [Bernice] to ... turn around and notice me so I could ask her what time it was.” Once on the porch, Woodel testified that he heard Bernice tell him to “[g]et out of my trailer” and that when she came to the back door with a knife, he “pushed her back” in order to actually enter the trailer. It would be unreasonable for the jury to conclude from this evidence that Woodel did not know — until it was too late to retreat — that he was unwelcome in the Moodys’ trailer.
Second, the postconvietion evidence did not establish that Dr. Dee “present[ed] misleading evidence to the jury that psychological testing indicated that Woodel was psychotic.” Dissenting op. at 817. To the contrary, Dr. Dee testified that he *810 could not interpret the Minnesota Multi-phasic Personality Inventory (MMPI) given to Woodel because the test results were invalid and repeatedly explained that other testing and his clinical evaluation demonstrated that Woodel was not psychotic or schizophrenic. Dr. Dee testified that he administered an instrument expressly designed to test for psychopathic traits and that Woodel’s “score didn’t even approach — even get close to the cut-off score of 80 that’s necessary [for] psychopathy.” Dr. Dee further testified that the invalid results of the MMPI, Woodel’s “idiosyncratic” interpretation of items in the psychological testing, and Woodel’s hand movements, led Dr. Dee to discover that Woodel’s parents were deaf. Accordingly, while Dr. Dee did not know prior to administering the MMPI that the results would likely be invalid due to Woodel’s status as a child of deaf parents, Dr. Dee discovered that fact and explained to the jury that Woodel was not psychotic.
Third, while Dr. Marcus testified in more detail about the deaf community and the particular difficulties faced by children of deaf adults (CODAs), Dr. Marcus’s explanation of Woodel’s experiences as a CODA and the psychological effects of those experiences did not materially differ from Dr. Dee’s presentation during the 2004 penalty phase. Dr. Dee testified about the “specific subculture” of hearing children of deaf parents. Dr. Dee explained that through adolescence, such children generally associate with and identify with deaf individuals and then experience “shock” and “hurt” when they are “progressively excluded from that culture because they have to enter the hearing world.” And because the parents do not know what it is like to hear, the parents cannot appreciate the struggles their children experience when transitioning between two worlds. Moreover, Dr. Dee explained that Woodel’s “verbalizations [were] often incomplete and almost b[are] in content” but when Woodel signed, “there was a richness of communication and depth of feeling.” Dr. Dee opined that as a result of Woodel’s experiences as a child, he had “difficulty with abstract concept formation and understanding feelings” but that Woodel nevertheless did, in fact, feel remorse.
Dr. Dee also testified about the social dynamic between deaf parents and hearing children generally and Woodel and his parents specifically. Dr. Dee explained that when Woodel’s parents were young, deaf children were generally raised in schools for the deaf — rather than by their parents — and that the administrators of these schools did not use sign language. Children raised in those environments learned that they could not communicate meaningfully with adults and were rarely told why they were being disciplined. As a result, the children looked to each other to solve problems, and once they became parents, this generation expected their children to act as peers and tended to be either very permissive or arbitrarily harsh. Dr. Dee noted that where the children of deaf parents can hear, there is an additional layer of “pseudoresponsibility and pseudomaturity” thrust upon the children. He explained that because they could hear and speak, Woodel and his sister, like many CODAs, were expected to communicate for their parents, often in developmentally inappropriate situations such as when a parent needed medical care or was questioned by law enforcement officers.
Finally, while Dr. Dee did not himself use sign language to communicate with Woodel, Dr. Dee was able to interview Woodel about his upbringing. In addition to testifying about the struggles Woodel and his siblings faced as CODAs, Dr. Dee testified about other “pernicious factors going on in” Woodel’s childhood. Dr. Dee *811 explained that Woodel and his siblings “were frequently abandoned by their parents.” Dr. Dee noted that Woodel moved at least twenty-three times before he was fifteen years old — including being left at a children’s home for approximately two years — that the siblings would be left with relatives for long periods, and that for days at a time, they would be left with “whomever would take them” or entirely without adult supervision. Dr. Dee explained that such abandonment “leads to terrifying loneliness,” “chronic depression,” and “low self-esteem.” Dr. Dee also testified that Woodel was physically abused on at least one occasion. Further, while Woodel did not report any sexual abuse, Woodel’s sister testified that she was sexually abused by one of her mother’s boyfriends, and despite Woodel’s denial, Dr. Dee suspected that Woodel might also have been sexually abused. Overall, Dr. Dee opined that Woodel’s childhood was “[f]illed with some of the most spectacular neglect and abuse that I think I [have observed] ever.”
Based on the foregoing, this is not a case in which “minimal mitigation evidence [was] presented to the jury at Woodel’s resentencing” and “other significant mitigation” was overlooked. Dissenting op. at 811, 819. Accordingly, I concur in the majority’s conclusion that a new penalty phase is not warranted.
POLSTON, C.J., concurs.